IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 16-cv-00009 |
| ) | |
| AMERICAN COMMERCIAL LINES, Inc., and ) | |
| ACBL TRANSPORTATION SERVICES, LLC, ) | |
| f/k/a ACL TRANSPORTATION SERVICES, LLC, ) | |
| ) | |
| Defendants. ) | |

# COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the United States Environmental Protection Agency ("EPA"), alleges as follows:

Nature of the Action

1. This is a civil action seeking civil penalties under Section 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b) and (d), against Defendants American Commercial Lines, Inc. ("ACL"), and ACBL Transportation Services, LLC ("ACBLTS"). Over the course of nearly seven years, from their facility in Cairo, Illinois, Defendants discharged four different kinds of pollutants into the Ohio River at levels in excess of the limits set forth in the National Pollutant Discharge Elimination System ("NPDES") permits issued to them, in violation of the CWA, Section 301(a), 33 U.S.C. § 1311(a).

Jurisdiction and Venue

2. This Court has jurisdiction over the subject matter of this action under Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

3.   Venue is proper in the Southern District of Illinois because the Defendants committed the violations at their facility in Cairo, Illinois, which is located in Alexander County, within the Southern District of Illinois. *See* 33 U.S.C. § 1319(b); 28 U.S.C. § 1391(b) and (c).

4.   The United States has authority to bring this action on behalf of the EPA under Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

5.   Notice of the commencement of this action has been provided to the State of Illinois pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b).

## Parties

6.   The Plaintiff in this action is the United States of America, acting at the request and on behalf of the EPA.

7.   Defendant ACL is a privately-owned Delaware corporation, headquartered in Jeffersonville, Indiana, which regularly conducts business in the State of Illinois. Founded in 1915 to ship coal on the Kentucky River, the company has grown over the past 100 years into one of the largest and most diversified marine transportation services companies in the United States. At all times relevant to this Complaint, ACL owned a marine transportation service facility (hereinafter, "the Facility") in Cairo, Illinois. The Facility occupies approximately 37 acres, including approximately 900 feet of frontage on the Ohio River, and provides a base of operations for barge fleeting and shifting, barge cleaning and repair, and topside-towboat repair.

8.   Defendant ACBLTS (formerly known as ACL Transportation Services) is a limited-liability Delaware corporation and a wholly-owned subsidiary of ACL that regularly conducts business in the State of Illinois. ACBLTS has offices located at 14614 Ohio River Levee Road, Cairo, Illinois 62914. In or around June 2013, ACBLTS took over day-to-day operation of the Facility. ACBLTS also leases approximately 22,400 feet of additional river frontage near the Facility.

9. Each Defendant is a "person," as that term is defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

10. The Ohio River is a "navigable water," as that term is defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

Statutory and Regulatory Authority

11. The objective of the CWA is "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

12. To accomplish the objective of the Act, Section 301(a) of the CWA prohibits the discharge of any pollutant except as authorized by, and in compliance with, certain enumerated sections of the CWA, including Section 402, 33 U.S.C. § 1342. *See* 33 U.S.C. § 1311(a).

13. Section 502(6) of the CWA defines the term "pollutant" to include dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological material, radioactive material, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. *See* 33 U.S.C. § 1362(6).

14. Section 502(12) of the CWA defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source . . . ." *See* 33 U.S.C. § 1362.

15. Section 502(14) of the CWA defines the term "point source" as any discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft from which pollutants are or may be discharged. *See* 33 U.S.C. § 1362(14).

16. Section 502(7) of the CWA defines the term "navigable waters" as the waters of the United States, including its territorial seas. *See* 33 U.S.C. § 1362(7).

17. Section 502(14) of the CWA defines the term "effluent limitation" as any restriction established by a State or EPA on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of a contiguous zone, or the ocean, including schedules of compliance. *See* 33 U.S.C. § 1362(11).

18. Section 308(a) of the CWA authorizes the EPA to require the owner or operator of any point source to (i) establish and maintain records; (ii) make reports; (iii) install, use, and maintain monitoring equipment; (iv) sample effluent discharges; and (v) provide any and all other information the EPA may need to carry out the objectives of the CWA. *See* 33 U.S.C. § 1318(a).

19. Under Section 402(a) of the CWA, EPA may issue a permit, known as a National Pollutant Discharge Elimination System ("NPDES") permit, which authorizes the discharge of pollutants upon the condition that such discharge will meet the requirements of the CWA or other requirements that EPA may find are necessary. *See* 33 U.S.C. § 1342(a). Typically, such permits include effluent limitations and monitoring and reporting requirements, as well as operating and maintenance requirements.

20. EPA is authorized to specify effluent limitations in NPDES permits. *See* 33 U.S.C. §§ 1311, 1342.

21. Section 402 of the CWA authorizes states to request approval from EPA to administer their own permit programs for discharges into navigable waters within their jurisdiction. *See* 33 U.S.C. § 1342.

22. EPA approved the permit program for the State of Illinois under 33 U.S.C. § 1342(b) in 1977. *See* 42 Fed. Reg. 58566 (Nov. 10, 1977).

23. Pursuant to the State's permit program, the Illinois Environmental Protection Agency ("IEPA") issues NPDES permits, which have the same purpose and function as an NPDES permit issued by EPA.

24. Although IEPA is responsible for administering the NPDES program in Illinois, EPA retains independent authority to enforce the CWA in Illinois, including enforcing the conditions of NPDES permits issued by IEPA. *See* 33 U.S.C. §§ 1319 and 1342(i).

25. A violation of an NPDES permit is a violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

26. Each discharge of a pollutant in excess of the effluent limitations contained in the permit constitutes a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day of the excessive discharge.

27. Each violation of effluent limitations calculated for monthly averages constitutes between 28 and 31 (depending on the month of the violation) separate days of violation of the permit and of Section 301 of the Act, 33 U.S.C. § 1311.

28. A person who violates the CWA after January 12, 2009, is subject to a civil penalty not to exceed $37,500 per day for each violation. *See* 33 U.S.C. § 1319(d); 74 Fed. Reg. 626 (Jan. 7, 2009).

29. Section 309(b) of the CWA authorizes EPA to commence a civil action for injunctive relief and civil penalties whenever any person has violated Section 301 of the CWA, 33 U.S.C. § 1311, or has violated any permit condition or limitation in a permit issued under Section 402 of the CWA, 33 U.S.C. § 1342. *See* 33 U.S.C. § 1319(b).

<u>General Allegations</u>

30. Defendant ACL owns a barge cleaning facility at 14614 Ohio River Levee Road, Cairo, Illinois 62914 (the Facility).

31.     Cairo is the county seat for Alexander County, Illinois, the southernmost county in the State of Illinois.  The town is located at the confluence of the Mississippi and Ohio Rivers and boasts fewer than 3,000 residents.  Public boat ramps can be found along the Ohio River in Cairo, including at nearby Fort Defiance State Park, and the portion of the Ohio River that borders Cairo.  The entire stretch of the Ohio River running along the eastern border of Cairo to which Defendants discharged pollutants is designated by the State of Illinois for primary contact recreation use during the months of May to October.

32.     On May 11, 2007, IEPA issued Illinois NPDES Permit No. IL00069205 to ACL (then known as "American Commercial Marine Service Company"), pursuant to the Illinois Environmental Protect Act and the CWA (hereinafter the "2007 permit").

33.     Under the terms of the 2007 permit, ACL was allowed to discharge over 10,000 gallons of treated sanitary waste water, ballast water (stormwater and river water that accumulates in voids on a barge), and cleaning process water from the Facility (then located at Route #1 Urbandale Ramp, Mound City, Illinois 62914) through Outfalls 001, 002, 003, 004, and 005 and into the Ohio River each day, subject to certain terms and conditions, including limits on certain pollutants.

34.     Beginning in and around July 2013, ACL's subsidiary, ACBLTS, assumed responsibility for the day-to-day operations of the Facility.

35.     On June 18, 2013, in anticipation of that change, IEPA re-issued Illinois NPDES Permit No. IL00069205 to ACBLTS, which was then known as ACL Transportation Services (hereinafter, the "2013 permit").  Although the 2013 permit had some different terms and conditions, including lower allowable limits for certain pollutants, it bore the same permit number and continued to impose limits on various pollutants discharged from the Facility.

36. Some of the limits in the Defendants' Illinois NPDES permits were based on a daily discharge amount, and some were based on a monthly average.

    a. The "daily discharge" meant the amount of a particular pollutant that was discharged during a calendar day, or any 24-hour period that would reasonably represent a calendar day for purposes of sampling. For pollutants with limitations expressed in units of mass, the permits specified that daily discharge would be measured by calculating the total mass of the pollutant discharged over the course of the day. For pollutants with limitations expressed in other units of measurement, the permits defined "daily discharge" as "the average measurement of the pollutant over the day."

    b. The "average monthly discharge limitation (30 day average)" meant "the highest allowable average of daily discharges over a calendar month." The monthly average was calculated by dividing the sum of all daily discharges measured during a calendar month by the number of daily discharge measurements taken during that same month.

37. To ensure compliance with permit limits, the Illinois NPDES permits required the Defendants to monitor their own discharges at the Facility by sampling them at various intervals and submitting the results in Discharge Monitoring Reports ("DMRs") to the IEPA.

38. The Defendants' own DMRs show that, from June 2007 to February 2014, they discharged pollutants from the Facility to the Ohio River at concentrations well above their NPDES permit limits, in violation of the CWA.

    a. From June 2007 to June 2013, ACL repeatedly and consistently discharged pollutants from the Facility to the Ohio River in excess of the limits set forth in the 2007 NPDES permit.

    b. From July 2013 to February 2014, ACL and ACBLTS continued to discharge pollutants from the Facility to the Ohio River in excess of the limits set forth in the 2013 NPDES permit.

Specific Allegations

39. The Defendants exceeded their permit limits at four different outfalls: one from barge cleaning water (Outfall 001), two from office septic systems (Outfalls 002 and 003), and one from a marine sanitation device (Outfall 005). Each of those four outfalls is a "point source," as that term is defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14), and 40 C.F.R. § 122.2.

40. The Defendants exceeded their permit limits with regard to four separate parameters: (1) Biological Oxygen Demand ("BOD") 5-day; (2) Total Suspended Solids; (3) Total Residual Chlorine; and (4) Fecal Coliform. Those four parameters are each "pollutants," as that term is defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

*Biochemical / Biological Oxygen Demand (BOD) 5-Day*

41. BOD is a chemical procedure for determining how fast biological organisms use up oxygen in a body of water. To obtain a BOD 5-Day measurement, dissolved oxygen concentrations in a sample are measured before and after a five-day incubation period in a dark, temperature-controlled environment. BOD is used in water quality management and assessment, ecology and environmental science, and it can be considered an indication of the general quality of a water source.

42. Most pristine rivers will have a 5-day BOD below 1 milligram per liter (mg/L). Moderately polluted rivers may have a BOD concentration in the range of 2 to 8 mg/L. Municipal sewage that is efficiently treated by a three-stage process would have a concentration of about 20 mg/L or less. Untreated sewage varies but averages around 200 mg/L or more in the United States.

43. The 2007 and 2013 permits for the relevant outfalls set the daily maximum limit for BOD 5-day at less than or equal to 60 mg/L and the monthly average limit at less than or equal to 30 mg/L.

44. From June 2007 to February 2014, ACL and ACBLTS exceeded the daily BOD 5-day limit under their NPDES permits at least 68 times.

   a. From June 2007 to December 2010, ACL exceeded the daily BOD 5-day limit at least 45 times. The highest reported exceedance occurred during the monitoring period that ended on August 31, 2007, when the reported BOD 5-day daily measurement at Outfall 002 measured 620 mg/L, a concentration over 10 times higher than the permit limit.

   b. From January 2011 to June 2013, ACL exceeded the daily BOD 5-day limit at least 22 times. The highest reported exceedance occurred during the monitoring period that ended on June 30, 2011, when the reported BOD 5-day daily measurement at Outfall 002 measured 364 mg/L, a concentration over six times higher than the permit limit.

   c. From July 2013 to February 2014, ACL and ACBLTS exceeded the daily BOD 5-day limit on at least one occasion, during the monitoring period that ended on July 31, 2013, when the BOD 5-day daily measurement at Outfall 003 measured 66.5 mg/L, a concentration 11% higher than the permit limit.

45. From June 2007 to February 2014, ACL and ACBLTS exceeded the monthly average limit for BOD 5-day under their NPDES permits at least 121 times.

   a. From June 2007 to December 2010, ACL exceeded the monthly average limit for BOD 5-day at least 71 times. The highest reported exceedance occurred during the monitoring period that ended on August 31, 2007, when the reported BOD 5-day monthly average at Outfall 002 measured 620 mg/L, a concentration over 20 times higher than the permit limit.

   b. From January 2011 to June 2013, ACL exceeded the monthly average limit for BOD 5-day at least 47 times. The highest reported exceedance occurred

        during the monitoring period that ended on June 30, 2011, when the reported BOD 5-day monthly average at Outfall 002 measured 364 mg/L, a concentration over 12 times higher than the permit limit.

    c.    From July 2013 to February 2014, ACL and ACBLTS exceeded the monthly average limit for BOD 5-day on at least three occasions. The highest reported exceedance occurred during the monitoring period that ended on February 28, 2014, when the BOD 5-day monthly average measurement at Outfall 003 measured 36.6 mg/L, a concentration 22% higher than the permit limit.

*Total Suspended Solids (TSS)*

46. TSS is a water quality measurement listed as a conventional pollutant in the CWA. It can include a wide variety of material, such as silt, decaying plant and animal matter, industrial wastes, and sewage. High concentrations of suspended solids can cause many problems for stream health and aquatic life. High TSS can block light from reaching submerged vegetation, which will reduce photosynthesis rates and cause less dissolved oxygen to be released into the water by plants. The decrease in water clarity caused by TSS can affect the ability of fish to see and catch food. Suspended sediment can also clog fish gills, reduce growth rates, decrease resistance to disease, and prevent egg and larval development.

47. Under the 2007 and 2013 permits, Defendants were required to limit TSS to an amount less than or equal to 60 mg/L on any given day and an amount less than or equal to 30 mg/L for the monthly average.

48. From June 2007 to February 2014, ACL and ACBLTS exceeded the daily TSS limit under their NPDES permits at least 45 times.

    a.    From June 2007 to December 2010, ACL exceeded the daily TSS limit at least 20 times. The highest reported exceedance occurred during the monitoring period that ended on December 31, 2008, when the reported TSS daily

        maximum at Outfall 003 measured 168 mg/L, a concentration nearly three times higher than the permit limit.

    b.    From January 2011 to June 2013, ACL exceeded the daily TSS limit at least 23 times. The highest reported exceedance occurred during the monitoring periods that ended on April 30, 2012, and September 30, 2012, when the reported TSS daily maximum at Outfall 003 measured 650 mg/L, a concentration nearly 11 times higher than the permit limit.

    c.    From July 2013 to February 2014, ACL and ACBLTS exceeded the daily TSS limit at least twice. The highest reported exceedance occurring during the monitoring period that ended on July 31, 2013, when the reported TSS daily maximum at Outfall 003 measured 113 mg/L, a concentration nearly twice the permit limit.

49.    From June 2007 to February 2014, ACL and ACBLTS exceeded the monthly average limit for TSS under their NPDES permits at least 102 times.

    a.    From June 2007 to December 2010, ACL exceeded the monthly average limit for TSS at least 54 times. The highest reported exceedance occurred during the monitoring period that ended on December 31, 2008, when the reported monthly average TSS at Outfall 003 measured 168 mg/L, a concentration over five times higher than the permit limit.

    b.    From January 2011 to June 2013, ACL exceeded the monthly average limit for TSS at least 44 times. The highest reported exceedance occurred during the monitoring periods that ended on April 30, 2012, and September 30, 2012, when the reported monthly average TSS at Outfall 003 measured 650 mg/L, a concentration over 20 times higher than the permit limit.

    c.    From July 2013 to February 2014, ACL and ACBLTS exceeded the monthly average limit for TSS at least four times. The highest reported exceedance occurring during the monitoring period that ended on January 31, 2014, when the reported monthly average TSS at Outfall 002 measured 58 mg/L, a concentration nearly twice the permit limit.

*Total Residual Chlorine*

50. Total Residual Chlorine is an important environmental measure because chlorine is generally toxic to fish and harmful to aquatic biota even at low concentrations. The toxicity to aquatic life depends on the concentration of the residual chlorine, as well as the dilutions that take place in the receiving waters. Generally, the National Academy of Sciences indicates that aquatic life will be protected as long as the concentration of residual chlorine does not exceed 0.003 mg/L at any time or place. Aquatic organisms can tolerate short-term exposure to relatively high levels of chlorine, with total residual chlorine no higher than 0.05 mg/L for a period of up to 30 minutes in any 24-hour period.

51. The 2007 permit limited the daily maximum total residual chlorine measurement to 0.05 mg/L or less at Outfalls 002, 003, and 005. The 2013 permit did not limit chlorine.

52. From June 2007 to June 2013, ACL exceeded the daily maximum limit for total residual chlorine under its NPDES permit at least 100 times.

    a. From June 2007 to December 2010, ACL exceeded the daily maximum limit for total residual chlorine at least 77 times. The highest reported exceedance occurred during the monitoring period that ended on September 30, 2009, when the reported total residual chlorine at Outfall 005 measured 37.2 mg/L, a concentration over 700 times higher than the permit limit.

    b. From January 2011 to June 2013, ACL exceeded the daily maximum limit for total residual chlorine at least 23 times. The highest reported exceedance occurred during the monitoring period that ended on August 31, 2012, when the reported total residual chlorine at Outfall 005 measured 3.95 mg/L, a concentration 79 times higher than the permit limit.

*Fecal Coliform*

53. Fecal Coliform colonies indicate water contamination by fecal matter, which may be of human or animal origin. Typical sources include wildlife, farm animals, and malfunctioning sewage systems (domestic or municipal). The presence of fecal coliform can affect the suitability of the water for recreational use (such as swimming), as it generally indicates an increased risk that harmful pathogens may be present in the water. Diseases and illnesses such as typhoid fever, hepatitis, gastroenteritis, and dysentery can be contracted in waters with high fecal coliform counts.

54. The ACL permit limited the daily maximum measurement for fecal coliform to no more than 400 colonies/100 mL. ACBLTS was limited to 200 colonies/100 mL in its permit.

55. From June 2007 to February 2014, ACL and ACBLTS exceeded the daily maximum limit for fecal coliform under their NPDES permits at least 118 times.

  a. From June 2007 to December 2010, ACL exceeded the daily maximum for fecal coliform at least 55 times. On 36 of those occasions, the fecal coliform measurement exceeded the NDPES permit limit by nine times or more. The highest reported exceedance occurred during the monitoring period ending November 30, 2007, when the fecal coliform at Outfall 003 measured 177,600 colonies/100 mL, a measurement 444 times higher than the permit limit.

  b. From January 2011 to June 2013, ACL exceeded the daily maximum for fecal coliform at least 61 times. The highest reported exceedance was 40,000 colonies/100 mL, a measurement 100 times higher than the permit limit. ACL reported fecal coliform measurements of 40,000 colonies/100mL a total of 15 times during this period, all at Outfalls 002 and 003.

  c. From July 2013 to February 2014, ACL and ACBLTS exceeded the daily maximum for fecal coliform at least twice. The highest reported exceedance occurred during the monitoring period that ended on July 31, 2013, when the

fecal coliform at Outfall 002 measured 40,000 colonies/100 mL, a measurement 200 times higher than the permit limit.

56. In 2012, IEPA listed the portion of the Ohio River where the Facility is located as impaired for primary contact recreation due to high amounts of fecal coliform in the water.

## COUNT 1

### Violations of the 2007 Permit by Defendant ACL

57. Paragraphs 1 through 56 are hereby realleged and incorporated by reference.

58. ACL was the owner and/or operator of the Facility from June 2007 through June 2013.

59. From June 2007 to June 2013, ACL violated the CWA on at least 542 occasions, representing 6,899 violation days, as the effluent discharges from the Facility (Outfalls 001, 002, 003, and 005) to the Ohio River repeatedly and consistently contained the pollutants BOD 5-day, TSS, total residual chlorine, and fecal coliform at levels that exceeded the effluent limits allowable under the 2007 permit. The specific violations are set forth in Exhibit A. These discharges are each discharges of pollutants in violations of the applicable permit.

60. For each violation of the 2007 permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a), referenced above, Defendant ACL is liable for a civil penalty of up to $37,500 per day, pursuant to 33 U.S.C. § 1319(d).

## COUNT 2

### Violations of the 2013 Permit by Defendants ACL and ACBLTS

61. Paragraphs 1 through 56 are hereby realleged and incorporated by reference.

62. ACL and ACBLTS were each owners and/or operators of the Facility from June 2013 through February 2014.

63. From July 2013 to February 2014, ACL and ACBLTS violated the CWA on at least 12 occasions, representing 216 violation days, as effluent discharges from the Facility (Outfalls 002 and 003) to the Ohio River continued to contain the pollutants BOD 5-day, TSS, and fecal coliform at levels that exceeded the effluent limits allowable under the 2013 permit. The specific violations are set forth in Exhibit B. These discharges are each discharges of pollutants in violations of the applicable permit.

64. For each violation of the 2013 permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a), referenced above, Defendants ACL and ACBLTS are liable for a civil penalty of up to $37,500 per day, pursuant to 33 U.S.C. § 1319(d).

## Relief Requested

WHEREFORE, The United States of America respectfully requests that this Court:

A. Award the assessment of civil penalties of up to $37,500 per day against Defendant ACL for each violation of the CWA that occurred from the monitoring period that ended on January 31, 2011, to the monitoring period that ended on June 30, 2013;

B. Award the assessment of civil penalties of up to $37,500 per day per defendant against Defendants ACL and ACBLTS for each violation of the CWA that occurred from the monitoring period that ended on July 31, 2013, to the monitoring period that ended on February 28, 2014;

C. Award the United States its costs and disbursements for this action; and

D. Award such other relief as this Court may deem just and proper.

JOHN C. CRUDEN
ASSISTANT ATTORNEY GENERAL
Environment and Natural Resources Division
United States Department of Justice

JAMES L. PORTER
ACTING UNITED STATES ATTORNEY

*s/ Nathan D. Stump*
NATHAN D. STUMP
Assistant United States Attorney
NICHOLAS J. BIERSBACH
Assistant United States Attorney
9 Executive Drive
Fairview Heights, Illinois 62208
Tel: (618) 628-3700
Fax: (618) 628-3720
Email: nathan.stump@usdoj.gov

16